1
2
3
4
5

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
Pamela E. Prescott Esq. (SBN: 328243)
pamela@kazlg.com
245 Fischer Avenue, Suite D1
Costa Mesa, CA 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

6
7
8
9
10

**KELLETT & BARTHOLOW PLLC**
Theodore O. Bartholow, III*
thad@kblawtx.com
11300 N. Central Expy., Suite 301
Dallas, TX 75243
Telephone: (214) 696-9000
Facsimile: (214) 696-9001
*Motion to appear pro hac vice forthcoming

11

[Additional Counsel on Signature Page]

12

*Attorneys for Plaintiffs*

13
14

**UNITED STATES DISTRICT COURT FOR**
**THE NORTHERN DISTRICT OF CALIFORNIA**

15
16
17

**LINDA JORDAN, BASIL HIGGS, CHAD NICHOLSON, and TREVOR ZANDER, individually and on behalf of all others similarly situated,**

Case No.:

**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR VIOLATIONS OF:**

18
19

**Plaintiffs,**

20

**v.**

21
22

**WELLS FARGO & COMPANY; and WELLS FARGO BANK, N.A.,**

1) **CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL"), CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*;**
2) **CONVERSION; and,**
3) **UNJUST ENRICHMENT.**

23

**Defendants.**

**JURY TRIAL DEMANDED**

24
25
26
27
28

Plaintiff Linda Jordan ("Plaintiff Jordan" or "Jordan"), Basil Higgs ("Plaintiff Higgs" or "Higgs"), Chad Nicholson ("Plaintiff Nicholson" or "Nicholson"), and Trevor Zander ("Plaintiff Zander" or "Zander") (together, the "Plaintiffs") bring this complaint, by and through their attorneys and on behalf of all others similarly situated, against Defendants Wells Fargo & Company ("WFC") and Wells Fargo Bank, N.A. ("Wells Fargo Bank") (together, the "Defendants" or "Wells Fargo") and allege upon information and belief as follows:

## INTRODUCTION

1. Just as the dust settles on one scandal involving Wells Fargo, another one is coming to light—this time in the form of the unauthorized enrollment in various consumer and mortgage-related products.

2. Indeed, starting around November of 2023, consumers across the country began receiving cryptic letters from Wells Fargo indicating that they were enrolled in various home warranty and consumer protection products that they did not consent to nor were they even aware existed prior to receiving this communication from Wells Fargo.

3. Upon information and belief, Wells Fargo unilaterally enrolled tens of thousands of consumers (including Plaintiffs) in these programs, *without their knowledge or consent*, including consumers *who did not even have an account with Wells Fargo*.

4. Plaintiffs further are informed and believe that consumers were unknowingly charged for these products and had their personal information used, without their consent, in order to be enrolled in these products without their knowledge.

5. Wells Fargo's surreptitious enrollments of Plaintiffs began as early as 2008 and continued through at least 2021. Wells Fargo's unscrupulous actions were completely concealed by Wells Fargo until about November of 2023 when Wells Fargo began disclosing these enrollments to consumers in an apparent attempt to downplay liability.

6.      Tellingly, for customers, Wells Fargo omits from these disclosures how much money was diverted from each consumer's account to these unwanted products, making it impossible for a consumer to determine the amount of their actual damages, including their out-of-pocket harm. Nor does Wells Fargo alert non-customers of how it obtained their personal information in the first instance.

7.      To make matters worse, many of these letters from Wells Fargo do not even expressly offer compensation to those who were secretly enrolled in these products initially, but rather, in these form letters, consumers are simply directed to call Wells Fargo, within 60 days of receiving the letter, if they believed the enrollment was not "authorized or wanted."

8.      However, as reflected in the online outrage and confusion from consumers, many people simply tossed out these letters believing they were a scam or junk mail. This is especially true for those who did not have an existing account with Wells Fargo and reasonably believed that the letter was sent in error or part of a phishing scam.

9.      Upon information and belief, the consumers who did call Wells Fargo to dispute the enrollment in these products were offered a fraction of their actual damages, which remained concealed, making any relief presently offered by Wells Fargo illusory and wholly inadequate. Representatives were unable or unwilling to tell these customers exactly how much money was diverted from their accounts to these secretly enrolled unauthorized products.

10.     Some customers received a different disclosure, in the form of a mailed check and letter, which explained they were "eligible for compensation" for certain products associated with their Wells Fargo accounts.[1] Recipient customers were

---

[1] Erica Grieder, *Wells Fargo is sending checks to some current and former customers. Here's what to know.*, Houston Chronicle (Dec. 27, 2023), https://www.houstonchronicle.com/business/article/what-to-know-about-wells-fargo-checks-18568099.php [https://perma.cc/2GCR-KB98].

wary of the potential for a financial scam, particularly those who no longer held a Wells Fargo bank account.[2]

11.     Wells Fargo's flippant attempt to mitigate its liability is inadequate and has left consumers, including Plaintiffs, facing ongoing harm (including invasion of privacy) and out-of-pocket loss that has yet to be reimbursed.

12.     Plaintiffs make these allegations on information and belief, with the exception of those allegations that pertain to Plaintiffs, or to Plaintiffs' counsel, which Plaintiffs allege on personal knowledge.

13.     While many violations are described below with specificity, the Complaint alleges violations of each statute cited in its entirety.

14.     Unless otherwise indicated, the use of Defendants' names in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of the Defendants, respectively.

## JURISDICTION AND VENUE

15.     The Court has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because: (i) there is minimal diversity; (ii) Defendants are not government entities against whom the District Court may be foreclosed from ordering relief; (iii) there are more than one hundred (100) people in the putative class; and (iv) the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

16.     This Court has general personal jurisdiction over Wells Fargo Bank because its principal place of business is in San Francisco, California. This Court also has general personal jurisdiction over WFC because its principal place of business is in San Francisco, California.

---

[2] *Id.*

17.     Additionally, this Court also has general personal jurisdiction over Wells Fargo Bank and WFC because their contacts with California are so constant and pervasive as to render them essentially at home in California.

18.     The exercise of specific personal jurisdiction over all Defendants is consistent with due process, as all Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and derive substantial revenue from services provided to, persons in this District and in California.

19.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because: (1) Defendants transact business within this judicial district and have their principal place of business is district, and because Plaintiff Jordan is a resident of Alameda County, California at all times relevant to these claims such that a substantial part of the events giving rise to Plaintiff Jordan's causes of action against Defendants while Plaintiff Jordan resided in this judicial district; and (2) Defendants' contacts with this District are sufficient to subject them to personal jurisdiction within this judicial district.

20.     Venue is also proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint occurred in this District.

## INTRADISTRICT ASSIGNMENT

21.     Because Wells Fargo's principal place of business is in San Francisco and Plaintiff Jordan resides in Alameda County, under Local Rule 3-2(d), the proper venue for this case is the San Francisco Division of the United States District Court for the Northern District of California.

## PARTIES

22.     Plaintiff Linda Jordan is a natural person and resident of California who presently resides within in this judicial district.

23.      Plaintiff Basil Higgs is a natural person and resident of North Carolina.

24.     Plaintiff Chad Nicholson is a natural person and resident of Florida.

25.     Plaintiff Trevor Zander is a natural person and resident of Minnesota.

26.     Upon information and belief, WFC is a diversified financial services company headquartered in San Francisco, California that provides banking, insurance, investments, mortgage banking, and consumer finance through banking stores, the internet, and other distribution channels to customers, businesses, and other institutions in all 50 states and in other countries.

27.     Upon information and belief, WFC exercises specific and financial control over the operations of Defendant Wells Fargo Bank, dictates the policies, procedures, and practices of Wells Fargo Bank, exercises power and control over the specific activities upon which the claims herein are based.

28.     Plaintiffs are informed and believe, and thereon allege, that Wells Fargo Bank is, and at all times mentioned herein was, a national bank association chartered under the laws of the United States with its primary place of business in Sioux Falls, South Dakota. Wells Fargo Bank provides WFC personal and commercial banking services and is WFC's principal subsidiary.

## WELLS FARGO'S HISTORY OF UNSCRUPULOUS BUSINESS PRACTICES

29.     The allegations in this lawsuit concerning Wells Fargo's targeted pattern and history of engaging in unfair and unlawful business practices at the expense of consumers and the general public are unfortunately not novel.

30.     For example, in 2015, "Wells Fargo and Assurant face[d] a force-placed insurance lawsuit alleging the financial firms artificially inflated force-placed insurance premiums charged to homeowners."[3] The plaintiffs in that lawsuit alleged that "the companies provided 'unnecessary or duplicative coverage' because the

---

[3] Heidi Turner, *Wells Fargo Hit with Force-Placed Insurance Lawsuit*, LawyersandSettlements.com (Aug. 19, 2015, 1:30 PM), https://www.lawyersandsettlements.com/legal-news/forced-placed-insurance-lawsuits/lender-insurance-lenders-force-placed-26-20854.html.

1  policies were backdated to collect premiums when there was no lapse in coverage or

2  no risk of loss."[4]

3  31.     Then, in July of 2018, KTLA 5 News reported a story entitled, "*Wells Fargo*

4  *Begins Refunding Customers Charged for Unauthorized Products Including Pet*

5  *Insurance*,"[5] noting that "[n]ot even pet insurance is safe from Wells Fargo's

6  scandals."

7  32.     According to that 2018 article, "Wells Fargo refund[ed] customers who were

8  harmed when the bank charged them for products including pet insurance, legal

9  services, home warranties and other forms of insurance[.]"[6]

10  33.     In December of 2022, the CFPB issued Prepared Remarks of CFPB Director

11  Rohit Chopra on the Wells Fargo Law Enforcement Action, which noted "[i]n the

12  CFPB's eleven years of existence, **Wells Fargo has consistently been one of the**

13  **most problematic repeat offenders of the banks and credit unions we supervise**

14  [.]"[7]

15  34.     Director Chopra went on to note examples of the systematic financial abuses

16  of consumers at the hands of Wells Fargo, observing that:

17  •  In 2015, CFPB ordered Wells Fargo to pay $24

18     million in penalties for its role in an illegal mortgage
       kickback scheme.

19  •  In 2016, it paid $4 million to the CFPB for scamming

20     student loan borrowers. A few months later, the

21

22  [4] *Id.*

22  [5] CNN Wire, *Wells Fargo Begins Refunding Customers Charged for Unauthorized*
23  *Products Including Pet Insurance*, KTLA 5 News (July 19, 2018, 7:07 PM),
     https://ktla.com/news/local-news/wells-fargo-begins-refunding-customers-
24  charged-for-unauthorized-products-including-pet-insurance-home-warranties/.

25  [6] *Id.*

26  [7] *Prepared Remarks of CFPB Director Rohit Chopra on the Wells Fargo Law*
     *Enforcement Action*, CFPB (Dec. 20, 2022),
27  https://www.consumerfinance.gov/about-us/newsroom/prepared-remarks-of-cfpb-
     director-rohit-chopra-on-the-wells-fargo-law-enforcement-action/ (emphasis
28  added).

CFPB fined Wells Fargo $100 million for its fake account fraud.

- In 2018, the CFPB assessed a $1 billion fine for illegal fees and insurance practices in its auto lending and mortgage lending business.[8]

35.    "Put simply, Wells Fargo is a corporate recidivist that puts one third of American households at risk of harm."[9]

36.    Unfortunately, Wells Fargo's unscrupulous business practices continue to the present day as evidenced by the recent disclosure of the unauthorized enrollment of consumers in various products, without the consumer's consent. Certain of these business practices have been the subject of class-action settlements, but the practices from which those settlements arise are not the subject of this action, which arises from different practices and a different factual predicate.

## FACTUAL ALLEGATIONS

37.    Beginning in or around November of 2023, consumers started receiving vague letters informing them that during a "recent review" of Defendants' records it was revealed they were enrolled in various products during the period of at least 2008 to about 2021.

38.    These form disclosure letters included language directing customers to call Defendants within 60 days if they believed this enrollment was not authorized.

39.    Indeed, upon information and belief, the letters often ended with the language similar to the following:

> **What you need to know**
> If you feel that the enrollment in this product was not authorized or not wanted by you, please call us within 60 days of the date of this letter so that we may care for any impact this enrollment may have caused. Otherwise, no action is needed.

---

[8] *Id.*

[9] *Id.*

**We're here to help**
If you have questions regarding enrollment in this product, please call us at 1-877-642-7826, Monday through Friday, 8:00 a.m. to 8:00 p.m. Central Time. We accept telecommunications relay service calls.

40.     Upon information and belief, Wells Fargo was unilaterally enrolling consumers in these various products, without their knowledge or consent, for financial gain.

41.     As part of this unfair and illegal enrollment scheme, Wells Fargo benefitted monetarily at the expense of consumers who were unknowingly paying for these services and/or having their personal information used without their knowledge or consent in order to increase the enrollment numbers in these insurance products, many of which are offered by third parties such as Affinion and Assurant.

42.     In 2015, "the Consumer Financial Protection Bureau (CFPB) took action against two credit card add-on product vendors – Affinion Group Holdings, Inc., Affinion's affiliated companies, and Intersections Inc. – for unfairly charging consumers for credit card add-on benefits they did not receive."[10]

43.     "Credit card companies often offer their customers 'add-on' services such as 'credit monitoring' or 'identity theft protection' for a monthly or annual membership fee."[11]

44.     "The add-on products are usually sold either by the bank itself or through a third-party vendor authorized by the bank to sell the product. Affinion . . . partnered with banks to provide these products to credit card holders and other bank customers."[12]

---

[10] *CFPB Takes Action Against Companies For Unfair Billing Of Credit Card Add-On Products And Services*, CFPB (July 1, 2015), https://www.consumerfinance.gov/about-us/newsroom/cfpb-takes-action-against-companies-for-unfair-billing-of-credit-card-add-on-products-and-services/.
[11] *Id.*
[12] *Id.*

45.    In response to these terribly troubling letters, many consumers turned to online platforms like Reddit and Credit Boards to voice their concerns and to vet the legitimacy of these letters.

46.    Upon receiving these form letters from Wells Fargo consumers (including Plaintiffs) were left with more questions than answers.

47.    One consumer posted a picture of one of these letters from Wells Fargo, dated November 15, 2023, to Reddit asking others to weigh in on whether this letter was legitimate or if it was part of a scam.[13]

48.    On or about November 21, 2023, another consumer posted to Credit Boards noting that they "[j]ust received this same letter today! [D]ifferent dates also but yes from 10 years ago. I HONESTLY don't remember ever banking with Wells [F]argo."[14]

49.    Upon information and belief, Wells Fargo's pervasive and targeted scam reached beyond its customer base to the general consuming public who were not account holders with Wells Fargo but too were secretly enrolled in these products without their knowledge or consent.

50.    Upon information and belief, despite having access to more specific information concerning these unauthorized enrollments (and the extent of each consumer's harm), Wells Fargo intentionally disseminated vague letters to discourage consumers from looking into the issue further and exercising their rights.

51.    Further, the time limit of 60 days included in these form letters is yet another attempt to limit the number of consumers that respond to these letters.

---

[13]  Hillbilly_Elegant, *Letter from Wells Fargo Regarding Identity Theft Protection- Affinion Product*, Reddit (Nov. 22, 2023, 9:20 AM), https://www.reddit.com/r/Scams/comments/181f54u/letter_from_wells_fargo_regarding_identity_theft/.

[14] WillowT, *A very special communication from Wells Fargo . . .* CreditBoards (Nov. 21, 2023), https://creditboards.com/forums/index.php?/topic/634914-a-very-special-communication-from-wells-fargo/.

52.     Upon information and belief, the purpose of these letters was not to make the consuming public whole but rather these letters are a throw away effort by Wells Fargo to attempt to shield itself from liability for yet another illegal business practice by offering an inadequate benefit.

53.     Upon information and belief, Wells Fargo knew that Plaintiffs and other similarly situated consumers did not consent to these various insurance-related products, as evidenced by the transmission of these recent letters.

54.     Despite this knowledge, Wells Fargo tiptoes around the issue by putting the burden on the consumer to figure out whether they in fact consented to a product *more than 10 years ago*, when Wells Fargo knows they did not.

55.     Plaintiffs and those similarly situated were not aware of the violations alleged herein, nor the facts giving rise to such violations, until they received the letters from Wells Fargo during late 2023 and early 2024.

56.     Indeed, Plaintiffs first learned of the surreptitious enrollment in later 2023 and early 2024 when they received a communication from Wells Fargo. Before that time, Plaintiffs had no reason to suspect that Wells Fargo had secretly enrolled them in home warranty and income protector products.

57.     Plaintiffs and those similarly situated did not discover and could not have discovered through the exercise of reasonable diligence, the fact that Defendants were unilaterally enrolling them in products they did not consent to nor apply for.

58.     Upon information and belief, Defendants, and their third-party insurance vendors, maintain exclusive control over the consent data relating to these various products.

59.     Plaintiffs are further informed and believe that Defendants intentionally concealed the complained of business practices herein for over a decade, preventing Plaintiffs and those similarly situated from discovering these violations prior to the end of 2023.

60. Fraudulent concealment tolls the statute of limitations because Plaintiffs and those similarly situated were unaware that their rights were being violated by Wells Fargo's secret enrollment of them in various products. Indeed, Defendants' violations were carried out in a way that precluded detection of the violations.

61. Upon information and belief, Defendants also knowingly used the personal information of Plaintiffs and those similarly situated (including account information, loan information, and banking information) in order to select which products to enroll the consumer in without their consent. Such actions were done in secrecy, as Wells Fargo concealed these illegal actions by failing to properly (and timely) disclose enrollment in these products and failing to disclose that funds were wrongfully diverted from the consumer in order to pay for these unwanted products that were not discoverable upon reviewing bank and mortgage statements.

62. As a result, the claims of Plaintiffs and those similarly situated did not accrue until their discovery in the end of 2023 and are tolled under equitable tolling principles such that they are timely.

### *Allegations Specific to Plaintiff Linda Jordan*

63. During February of 2024, Plaintiff Jordan received a letter from Defendants dated February 23, 2024, stating that, "[d]uring a recent review of [Defendants'] current and form customer accounts, [Defendants'] records indicated that you were enrolled in the Home Warranty product . . . [beginning] August 01, 2009 and [ending] September 01, 2009."

64. Plaintiff Jordan was shocked to receive this communication February 23, 2024 from Wells Fargo as Plaintiff Jordan *never applied for, opened, and/or held a checking or savings account with Wells Fargo at any point in time*.

65. Plaintiff Jordan also never consented to receive the Home Warranty product referenced in this February 23, 2024 letter, nor was she aware that she had been erroneously enrolled in this program until she received this letter.

66. On or about March 8, 2024, Plaintiff Jordan called the number listed on the

February 23, 2024 letter from Wells Fargo (i.e., 1-877-642-7826), which is a recorded telephone line.

67.    When the call connects, a pre-recorded voice message says this is the "Wells Fargo Customer Remediation Information Line" and directs consumers to press 1 for English, and then the phone rings.

68.    Plaintiff Jordan pressed 1 and was connected to a live representative who asked for Ms. Jordan's name, telephone number, and the reference number on the February 23, 2024 letter.  Plaintiff Jordan provided the information and was then placed on hold for about a minute.

69.    The representative came back on the line and informed Plaintiff Jordan that she received the February 23, 2024 letter because Plaintiff Jordan was enrolled in a Home Warranty product. The representative then offered Plaintiff Jordan a small monetary compensation for any charges she incurred relating to this enrollment. Notably, the representative *did not* inform Plaintiff Jordan of the actual amount she was charged for this product or how Wells Fargo obtained her information.

70.    When Plaintiff Jordan inquired further about this Home Warranty product, the call was disconnected.

71.    Plaintiff Jordan was then connected with a second representative, who again, offered Plaintiff Jordan the same small monetary offer in exchange for filling out a Mediation Request Form. Plaintiff Jordan did not accept this offer.

72.    Plaintiff Jordan then expressed concern to the second representative about how Wells Fargo obtained her information since Plaintiff Jordan did not have a bank account with Wells Fargo.

73.    The second representative put Plaintiff Jordan on hold for several minutes and then got back on the line and informed Plaintiff Jordan that she could not find that information.

74.    The second representative did, however, concede that Plaintiff Jordan likely received the February 23, 2024 letter from Wells Fargo because a Wells Fargo team

member may have opened this Home Warranty product account in Ms. Jordan's named (and without her consent or knowledge).

### *Allegations Specific to Plaintiff Basil Higgs*

75.    Plaintiff Higgs received a letter from Defendants dated February 1, 2024, stating that, "[d]uring a recent review of [Defendants'] current and form customer accounts, [Defendants'] records indicated that you were enrolled in the income Protector Plus product . . . [beginning] March 05, 2007 and [ending] March 27, 2007."

76.    Plaintiff Higgs was surprised to receive this communication from Wells Fargo as Plaintiff Higgs never consented to receive the income Protector Plus product referenced in this February 1, 2024 letter, nor was he aware that he had been erroneously enrolled in this program until he received this letter.

77.    A week later, Plaintiff Higgs called the number listed on the February 1, 2024 letter from Wells Fargo (i.e., 1-877-642-7826).

78.    The representative informed Plaintiff Higgs that he received the February 1, 2024 letter because Plaintiff Higgs was enrolled in the income Protector Plus product but could give him no other information about the account.

79.    Plaintiff Higgs was advised that a check a would be sent along with a document for his signature. The representative stated they did not possess further details but could try connecting Plaintiff Higgs to someone at Wells Fargo.

80.    Frustrated with the non-answers, Plaintiff Higgs declined to speak with an additional representative as he felt it would not be useful.

81.    To date, Plaintiff Higgs has not received a check or document from Wells Fargo, is still unaware of the amount he was charged for the income Protector Plus product, why he was enrolled in the income Protector Plus product, and whether Defendants opened other accounts without his knowledge or consent.

### *Allegations Specific to Plaintiff Chad Nicholson*

82.    During February of 2024, Plaintiff Nicholson received a letter from

Defendants dated January 30, 2024, stating that, "[d]uring a recent review of [Defendants'] current and form customer accounts, [Defendants'] records indicated that you were enrolled in the Disaster Mortgage product . . . [beginning] August 10, 2007 and [ending] October 1, 2007."

83.    Plaintiff Nicholson was surprised to receive the January 30, 2024 communication from Wells Fargo as Plaintiff Nicholson never consented to receive the Disaster Mortgage product referenced in this letter, nor was he aware that he had been erroneously enrolled in this program until he received this letter.

84.    Several weeks later, Plaintiff Nicholson called the number listed on the January 30, 2024 letter from Wells Fargo (i.e., 1-877-642-7826).

85.    The representative could not give Plaintiff Nicholson additional information about the Disaster Mortgage product account, but stated that he received the January 30, 2024 letter because he was enrolled in the product.

86.    The representative indicated Plaintiff Nicholson was entitled to a check of approximately $200. Plaintiff Nicholson asked directly if he was sent the letter and offered compensation so he would not sue for this account opened without his knowledge or consent, and he was told "yes."

87.    Plaintiff Nicholson has not received any compensation or further communication regarding his unauthorized enrollment in the Disaster Mortgage product.

### *Allegations Specific to Plaintiff Trevor Zander*

88.    During December of 2023, Plaintiff Zander received a letter from Defendants dated November 28, 2023, stating that, "[d]uring a recent review of [Defendants'] current and form customer accounts, [Defendants'] records indicated that you were enrolled in the Disaster Mortgage product … [beginning] April 10, 2009 and [ending] December 31, 2009."

89.    Plaintiff Zander was shocked to receive the November 28, 2023 communication from Wells Fargo as Plaintiff Zander had not been a Wells Fargo

customer for many years, and because he never consented to receive the Credit Defense product referenced in this letter, nor was he aware that he had been erroneously enrolled in this program until he received this letter.

90.    Several weeks later, Plaintiff Zander called the number listed on the November 28, 2023 letter from Wells Fargo (i.e., 1-877-642-7826).

91.    The representative informed Plaintiff Zander that he received the November 28, 2023 letter because he was enrolled in the Credit Defense product, and asked Plaintiff Zander if he authorized the service. Plaintiff Zander informed the representative that he had not authorized the enrollment.

92.    The representative informed Plaintiff Zander that he was entitled to a check of approximately $150.

93.    Plaintiff Zander was then issued a $150 check that he did not cash.

94.    To date, Plaintiff Zander is still unaware of the amount he was charged for the income Credit Defense Product, why he was enrolled in the income Credit Defense Product, and whether Defendants opened other accounts without his knowledge or consent.

## CLASS ALLEGATIONS

95.    Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated.

96.    Plaintiffs are members of and seek to represent a nationwide Class, pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) defined as:

> All persons within the United States who received at least one letter from Wells Fargo alerting them that they were enrolled in one or more unauthorized products other than an Unauthorized Account covered by the settlement in *Jabbari v. Wells Fargo & Co.*, No. 3:15-cv-02159-VC (N.D. Cal.).

97.   Plaintiffs Jordan and Nicholson are members of and seek to represent a nationwide Mortgage Sub-Class, pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) defined as:

> All persons within the United States who received at least one letter from Wells Fargo alerting them that they were enrolled in one or more unauthorized mortgage or home warranty related product(s).

98.   Additionally, Plaintiff Jordan is a member of and seeks to represent a California Sub-Class, pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3) and/or (b)(4), defined as:

> All persons with a residential address within California who received at least one letter from Wells Fargo alerting them that they were enrolled in one or more unauthorized products other than an Unauthorized Account covered by the settlement in *Jabbari v. Wells Fargo & Co.*, No. 3:15-cv-02159-VC (N.D. Cal.).

99.   Excluded from the Class and Sub-Classes are Defendants' officers, directors, and employees; any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant.

100.   Further excluded from the Class and Sub-Classes are members of the judiciary to whom this case is assigned, their families, and members of their staff.

101.   Plaintiffs reserve the right to modify the proposed class definitions, including but not limited to expanding the Class to protect additional individuals and to assert additional sub-classes as warranted by additional investigation.

102.   <u>Numerosity</u>: The members of the Class and Sub-Classes are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, the Class and Sub-Classes consists of tens of thousands of individuals nationwide.

103.   <u>Commonality</u>: There are questions of law and fact common to the Class and Sub-Classes, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

        a.     Whether Plaintiffs and the Class and Sub-Classes were enrolled in one or more products without their authorization;

        b.     Whether the conduct of Defendants was "unfair" as that term is defined in the UCL;

        c.     Whether Defendants were unjustly enriched by the complained of conduct herein;

        d.     Whether Defendants improperly diverted consumer funds to pay for one or more products that were not authorized or wanted by the consumer;

        e.     Whether Plaintiffs and the Class and Sub-Classes were damaged by Defendants, and the extent of such damages;

        f.     Whether Plaintiffs and the Class and Sub-Classes are entitled to declaratory relief; and,

        g.     Whether Plaintiffs and the California Sub-Class are entitled to injunctive relief.

104.   <u>Typicality</u>: Plaintiffs' claims are typical of those of the Class and Sub-Classes because Plaintiffs were enrolled in one or more products by Wells Fargo without their authorization or consent, and that they did not desire.

105.   <u>Adequacy of Representation</u>: Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class and Sub-Classes. Plaintiffs' Counsel are competent and experienced in litigating consumer class actions similar to this action.

106.   <u>Predominance</u>: Defendants have engaged in a common course of conduct toward Plaintiffs and members of the Class and Sub-Classes in that they were all enrolled in one or more product without their authorization and received a

substantially similar letter from Wells Fargo altering them of such enrollment. The common issues arising from Defendants' conduct affecting Class and Sub-Class Members set out above predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

107.   Superiority: A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class and Sub-Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class and Sub-Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class and Sub-Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

108.   Defendants have acted and continue to act on grounds generally applicable to the Class and Sub-Classes, thereby making appropriate, final injunctive relief and corresponding declaratory relief, with respect to the Class and Sub-Classes as a whole.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF THE CALIFORNIA**
**UNFAIR COMPETITION LAW (UCL)**
**CAL. BUS. AND PROF. CODE § 17200, *ET SEQ.***
***(On Behalf of Plaintiff Jordan and the California Sub-Class against Defendants)***

109.   Plaintiff Jordan realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

110.   The UCL defines "unfair business competition" to include any "unlawful, unfair, or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

111.   The UCL imposes strict liability. Plaintiff Jordan need not prove that Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

*"Deceptive" Prong*

112.   An omission is "deceptive" and actionable under the UCL if it is an omission of a fact that the defendant was obliged to disclose.

113.   Defendants were obliged to timely disclose that they enrolled consumers in various products. They failed to do so.

*"Unfair" Prong*

114.   A business practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practices against the gravity of the harm to the alleged victims.

115.   Defendants' actions constitute "unfair" business practices because, as alleged above, because Defendants intentionally and knowingly enrolled Plaintiff Jordan and the California Sub-Class into various products, without their knowledge or consent, and have failed to offer a proper remedy.

116.   Through their practices, Defendants generate millions of dollars which should have, in all fairness, should be disgorged and returned to Plaintiff Jordan and the California Sub-Class.

117.   The harm to Plaintiff Jordan and the California Sub-Class grossly outweighs the utility of Defendants' practices as there is no utility to practices of Defendants.

\*       \*       \*

118.   Defendants have and will continue to surreptitiously enroll consumers in products and fail to provide an adequate remedy to those harmed by such business practices. Consequently, the practices of Defendants constitute unfair and unlawful business practices within the meaning of the UCL.

119.   Pursuant to the UCL, Plaintiff Jordan and the California Sub-Class are entitled to preliminary and permanent injunctive relief and order that Defendants cease this unfair and unlawful competition, as well as disgorgement and restitution to Plaintiff Jordan and the California Sub-Class of all the revenues associated with this unfair and unlawful competition, or such portion of said revenues as the Court may find applicable.

120.   Without a prospective injunction, Plaintiff Jordan and the California Sub-Class cannot be confident that Defendants will correct its policies and practices and provide adequate relief. Indeed, Plaintiff Jordan has suffered a concrete and particularized legal harm as a result of Defendants conduct. There is a sufficient likelihood that she will again be wronged in a similar way as Defendants have access to Plaintiff Jordan's personal information and, absent a court order, there is nothing preventing Defendants from continuing to misuse Plaintiff Jordan's information to enroll her in unconsented for products in the future.

121.   Plaintiff Jordan and the California Sub-Class are also entitled, and seek, public injunctive relief.

**SECONDCAUSE OF ACTION**
**CONVERSION**
***(On Behalf of all Plaintiffs and all Classes against Defendants)***

122.   Plaintiffs reallege and incorporate herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

123.   Defendants exercised the wrongful dominion and control over the property of Plaintiffs and the Classes (i.e., an identifiable sum of money that was wrongfully applied to Defendants products without consent).

124.   Plaintiffs and the Classes have an ownership and right to the possession of their funds, which Defendants converted by wrongfully applying those funds to unconsented for products, which resulted in damages.

125.   Defendants acted intentionally by knowingly applying funds to these products that Plaintiffs and the Classes did not authorize or want.

126.   The exact sum of money that was converted can be readily determined through Defendants' business records.

**THIRD CAUSE OF ACTION**
**UNJUST ENRICHMENT**
***(On Behalf of all Plaintiffs and all Classes against Defendants)***

127.   Plaintiffs reallege and incorporate herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

128.   Plaintiffs and the Classes have conferred a benefit on Defendants by at a minimum having funds wrongly applied to one or more products without their consent or knowledge.

129.   Defendants' practice of enrolling Plaintiffs and members of the Classes into products without their consent also resulted in Plaintiffs and members of the Classes being denied the benefit of having their monthly payments fully applied to their mortgage accounts, as some of those funds were wrongly applied towards these products.

130.   Defendants appreciate and/or have knowledge of the benefits conferred upon it by Plaintiffs and the Classes.

131.   Under principles of equity and good conscience, Defendants should not be permitted to retain the monies they unjustly received as a result of its wrongful conduct described herein.

132.   Accordingly, Plaintiffs, on behalf of themselves and the other members of the Classes, seek restitution and disgorgement of all amounts by which Wells Fargo has been unjustly enriched.

//

1

## PRAYER FOR RELIEF

2

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants,

3

and each of them, as follows:

4
- Class certification of this action (including as to the Class and Sub-Classes);

5
- Appointment of Plaintiffs as Class Representative;

6
- Appointment of Plaintiffs' attorneys as Class Counsel;

7
- Injunctive and other equitable relief as may be appropriate against Defendants

8
  as necessary to protect the interests of Plaintiffs and other Class Members,

9
- An order prohibiting Defendants from engaging in unlawful and/or unfair acts

10
  described above;

11
- Public injunctive relief;

12
- An order of restitution and disgorgement from Defendants;

13
- An order awarding declaratory relief against Defendants declaring

14
  Defendants' conduct as unlawful;

15
- Costs of Suit;

16
- Pre- and post-judgment interest;

17
- An award of reasonable attorneys' fees and costs; and

18
- Any other relief the Court may deem just and proper, including interest.

19

## DEMAND FOR TRIAL BY JURY

20

Plaintiffs, individually and on behalf of all others similarly situated, hereby

21

demand a jury trial on all claims so triable.

22

Dated: March 29, 2024                          Respectfully submitted,

23

24

**KAZEROUNI LAW GROUP, APC**

25

By: */s/ Abbas Kazerounian*

26

Abbas Kazerounian, Esq.
Attorney for Plaintiffs

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**KELLETT & BARTHOLOW PLLC**
Theodore O. Bartholow, III
*pro hac vice forthcoming*
thad@kblawtx.com
11300 N. Central Expy., Suite 301
Dallas, TX 75243
Telephone: (214) 696-9000
Facsimile: (214) 696-9001

**KELLER ROHRBACK L.L.P.**
Derek W. Loeser
*pro hac vice forthcoming*
dloeser@kellerrohrback.com
Gretchen Freeman Cappio
*pro hac vice forthcoming*
gcappio@kellerrohrback.com
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
Facsimile: (206) 623-3384